McFARLAND *v.* DEERE & MANSUR MANUF'G Co. and another.

*(Circuit Court, N. D. Illinois. January 5, 1885.)*

1. PATENTS FOR INVENTIONS—CORN-PLANTERS—BERGEN PATENT, No. 46,629—CLAIM 6—PUBLIC USE.
   An automatic scraper, precisely as described in Bergen's patent, No. 46,629, for an improvement in corn-planters, was well known and in public use for at least three years before the date of the Bergen patent, and such patent cannot be sustained.

2. SAME—REISSUE No. 1,935—INFRINGEMENT.
   The first, second, third, and eighth claims of reissued patent No. 1,935, granted to George I. Bergen, April 18, 1865, for an improvement in corn-planters construed, and *held* not infringed by the device used by defendants.

In Equity.

*J. G. Manahan* and *C. H. Roberts,* for complainant.

*West & Bond,* for defendants.

*John R. Bennett,* for defendant George W. Brown.

BLODGETT, J. This is a bill in equity for an accounting as to profits and damages, by reason of the alleged infringement of reissued

patent No. 1,935, granted to George I. Bergen for "an improvement in corn-planters," the original patent, No. 40,789, being dated December 1, 1863, and the reissued patent bearing date April 18, 1865; and also patent No. 46,629, granted to George I. Bergen, March 7, 1865, for an "improvement in corn-planters," of both of which patents complainant claims to be owner by proper assignments, and no question is raised as to his title. Both of these patents have reference to that class of corn-planters known as "check-row planters," where the frame that carries the seed-dropping device is mounted on runners or blades, which, when planting, cut a furrow or crease in the ground into which the seed is dropped; and the main frame, carrying the driver, is mounted on wheels attached to the rear of the frame carrying the seed-dropping mechanism.

The principal features covered by reissued patent No. 1,935, which are in controversy in this case, are:

(1) The slotted joint by which the two frames are coupled together so as to allow each frame a certain amount of free vertical motion, so that, if the wheels pass over obstructions, or fall into depressions, they will not correspondingly raise or depress the forward frame. (2) A windlass journaled upon the rear frame, projecting over the forward frame, so that, by means of a chain or other flexible connection between the forward end of the windlass and the forward frame, the latter can be raised or lowered to regulate the depth which the runner shall go into the ground when planting, and also to raise the forward frame wholly off the ground for the purpose of turning the planter at the ends of the rows, or for transporting it from field to field.

The only feature of patent No. 46,629 which defendants are charged with infringing is that which shows scrapers so arranged that they can, be brought in contact with the wheels for cleaning them of the muck or dirt which adheres to them by a treadle or lever, and, when they have done their work, will at once drop automatically away from contact with the wheel on withdrawal of the pressure from the treadle. These elements of patent No. 1,935 are embodied in the first, second, third, and eighth claims, which are as follows:

"(1) The combination in a seed-planter of a front frame carrying the seeding mechanism and a drop-man's seat, and a rear frame carrying a coupling windlass and a driver's seat, with a slotted coupling, substantially as described, for the purposes set forth.

"(2) Balancing the front and rear frames of a seed-planter by a windlass, substantially in the manner and for the purposes set forth.

"(3) The windlass, C, to balance the front and rear frames or control the depth of planting in a seeding-machine, or to regulate the weight of the tongue upon the team, as set forth.

"(8) The slotted joint connecting the front and rear frames when the draft of the rear frame is effected by this coupling alone, and so as to allow a vertical movement of the front or rear frame, as and for the purposes set forth."

And the sixth claim of patent No. 46,629 covers the scraper-hanging device, which claim is as follows:

"(6) The scrapers, H, constructed as described, and mounted on the roller in such a manner as to automatically remove themselves from contact with the wheels, as and for the purpose set forth."

The bill charges infringement, also, of the first and second claims of the last-named patent; but it was not insisted upon at the hearing, and I understand this part of the case to be abandoned. The defendants deny infringement, and also deny the novelty of the features in controversy in each of these patents.

It seems to be conceded that this class of planters, in order to operate successfully, must have their rear and forward frames connected together by free joints, so as to give room for such liberty of movement that the vertical action of the forward frame will not be wholly controlled by that of the rear frame; and hence, as the proof shows, all the devices for double-frame machines which had preceded that of Bergen had provision for more or less flexibility between the frames, and Bergen states that the leading object of his improvement now in question is to secure "an extremely flexible connection between the frames, so that the machine will work equally well on rough and smooth ground;" and he provides by means of his slotted joints for a possible vertical movement of several inches between those frames. He intends, he says, to give his machine sufficient vertical motion to permit "either tube or wheel to enter a dead-furrow, or pass over clods, without materially changing the position of the other tube or wheel." A mere inspection of the defendant's machine, as illustrated by the models in proof, shows that they do not use such a slotted joint as is specifically described in the Bergen patent No. 1,935, as they have not provided for any such extreme flexibility between the frames as is called for in this reissued patent. Their joint is not properly described as a slotted joint, but is a free joint obtained by means of staples and eye-bolts.

When we look back into the prior art, we find, in the Chester Barton patent for a corn-planter, of February 16, 1858, a frame carrying the seeding device suspended beneath another frame mounted on wheels; the suspension being obtained by stirrups or slotted joints which permit free vertical motion between the two frames. In the patent of Hermann Kaller, dated July 17, 1860, for an "improvement in corn-planters," he describes a two-frame machine, the forward one of which is mounted on runners, and carries the seed-dropping device and shows a connection of this forward frame with the rear frame by "eyes or links." Here is certainly a suggestion of a coupling which might allow as much vertical motion as that described in the Bergen patent; and in the patent issued to J. C. Moore, dated July 8, 1862, we find he describes the two frames of his corn-planter as connected "by a swivel hinge in the center and guiding buffers on both sides, in such a manner that each frame can accommodate itself to the inequalities of the ground independent of the other," and what he calls his "guiding buffers" are almost identical in structure with the slotted joint described by Bergen; that is, remove the swivel hinge which connects the middle of the two frames and you have the Bergen coupling. In the patent to Armstrong of July 22, 1862, he

shows two frames, and while he does not describe any joint, he says "the forward frame rises and falls freely;" and in the Vandiver patent of October 6, 1863, he says "the two frames are pivoted together by bolts, so that they are free to rise and fall, or move independent of each other, in a vertical direction;" while the patent of George W. Brown, dated May 8, 1855, shows two frames coupled together by eye-bolt and staple joints. And all through the description of the machines of these inventors who preceded Bergen in this class of organizations, it seems to be conceded that, in order to secure their successful working, there must be more or less free movement between the frames; some describing specifically by their devices more play than others, but all showing some play. The eyes and links of Kaller would certainly allow of motion, limited only by the number and length of the links; while Moore says that his middle joint may consist of an eye-bolt and staple, the extent of motion which it would allow being, of course, only limited by the size of the eye-bolt and staple, but he adds, "or of any other convenient contrivance whereby both frames are left free to accommodate themselves, independent of each other, to the inequalities of the ground;" so that, with the buffers and guides shown by Moore's device operating with his central joint, which he expressly says must be such as to allow free motion to each frame independent of each other, there seems to me no ground for Bergen to occupy, except the specific slotted joint which he describes. Joints were old at the time Bergen entered the field. The construction of two-frame machines, connected together with free joints by links, had been shown, and the public had been told oft and again by patentees who had preceded Bergen in the field that there must be such a joint as would allow the forward frame to rise and fall freely. There was, therefore, no invention in making a joint which would allow more or less play; and it is not pretended that Bergen was the inventor of a slotted joint: he, at most, only used a slotted joint which others had devised and used before him, and directed the use of it in this particular place, and may be said to have provided specifically for a very long slot, so as to give a large amount of play between the frames. The Bergen slotted joint is, in fact, but an eye-bolt and broad staple, the length of slot being entirely a matter of mechanical construction.

Enough also appears in the proof to justify the conclusion that there was no utility in the "extremely flexible" joints shown in this Bergen patent; for, in his patent No. 46,629, he connects the two frames together by a central curved jointed bar, which does not allow as much movement between the frames as was provided for in the Moore patent of July 8, 1862; while both the machine of defendants and that of Brown, whose case was heard with this case, shows a great deal less play between the frames than was allowed by the slotted joints of Bergen's patent, and which he seems to have deemed necessary. The present machine made by Brown shows only a tip-

ping motion between the frames. From all which, I conclude that it was found by experience that there was not need for so much play between the frames as Bergen seems to have supposed necessary at the time he devised his machine; and this proof certainly suggests whether this feature of the patent is not void for want of utility; but I do not intend to rest my disposition of the case upon this point. I am therefore of opinion that if the claim of this patent for the slotted joint can be sustained at all, it must be for the specific device, and that the defendants do not use such a slotted joint as is described by Bergen.

As to the second element of this patent, which defendants are charged with infringing, there is certainly no windlass in the defendants' machine, but the defendants raise the forward frames from the ground for the purpose of turning in the field, or for traveling their machine upon its wheels alone, when not planting, by means of a lever, which, while it may produce the same result as Bergen's windlass, operates in an entirely different manner. Like the quality of flexibility between the frames, it seems that it was early found to be essential to the operation of this class of machines that some device should be adopted to raise the runners of the forward frame out of the ground in turning at the ends of the rows, or the machine would be so awkward and unmanageable as to be useless; and so we see that all who preceded Bergen showed some device for lifting the forward frame from the ground, the most common of which was to so arrange the driver's seat with a leverage behind the wheels that the weight of the driver might lift the forward frame from contact with the ground. It will be noticed that Bergen does not wholly dispense with that feature in his organization, as he provides that the weight of the driver may be used to balance the machine; and the question is, was Bergen the first to show a device which produced such a result, or do the defendants use his windlass?

The Chester Barton patent of February, 1858, showed an arrangement for raising the secondary frame, carrying the seeding device off the ground by means of a windlass, so that the whole weight was carried on the wheels. Kaller, in his patent of July, 1860, raised the forward frame by a lever fulcrumed on an independent castor wheel, and operated by the driver. Armstrong's patent of July, 1862, shows levers fulcrumed on the rear frame so as to lift the forward frame clear of the ground. With these devices before the public when Bergen introduced his windlass, he certainly was only entitled to the mode of lifting the forward frame which he specially exhibited. He is in no position to invoke the doctrine of equivalents as to his windlass. It appears from the proof in the case that two-framed machines, coupled together, the forward frame being carried upon runners, are certainly as old as the patent to George W. Brown, of May 8, 1855; and in that machine, and in all the subsequent two-frame machines, some device for raising the forward frame, either by levers

or windlasses, is always shown. I think the proof justifies me in saying that Barton and Bergen show the adoption of the windlass as the means of applying the power by which to raise the forward frame for all the necessary working purposes of the machine; while Brown, in his patent of 1855, and other inventors of improvements who succeeded him, all show the use of levers for the same purpose; and my conclusion is that the levers shown in the defendant's machine, whereby they raise the forward frames clear from the ground, and hold it suspended there, are but improvements upon the old levers shown in the machine of Brown and other older inventors, whereby the weight of the driver, through the aid of leverage, accomplished the same result; and that it may be properly said that the defendants have only carried forward to a more perfect working condition the levers of Brown, Kaller, and Armstrong, and have not entered the field occupied by those inventors who adopted the windlass, and therefore defendants cannot be said to infringe upon the windlass shown in the Bergen patent. As I have already said, they do not use a windlass, but use, in an improved form, levers which were older as a device for the same purpose than any of the windlass machines.

I now come to consider, for a moment, the charge of infringement of the sixth claim of patent No. 46,629, for the automatic scrapers. Like the other two features of these check-row corn-planters, it seems to have been understood, from the first efforts at the construction of these machines, that a scraper to remove the earth which should cling or adhere to the wheel was a necessary part of the organization. Running, as these machines were intended to do, upon the soft or newly-ploughed land of the corn-field, it might naturally have been expected that these wheels would clog to such an extent as to require some application of a scraper to remove the earth and prevent the machine from becoming unmanageable by being loaded up with dirt; and hence we find that in all, or nearly all, the large number of patents in the proof in this case, scrapers in some form are used. I do not find that any patentee showed a scraper which would automatically fall away from the wheel upon the removal of pressure on the treadle or lever, by which the scraper bar was moved; but I do find in the Vandiver patent of October 6, 1863, scrapers are shown which seem to be intended to operate automatically; that is, to remain constantly in contact with the wheel, except when turned back by means of the lever; and it can scarcely require invention to reverse this action, and so hang the scrapers upon the bar or rod carrying them that they will automatically cease to act when the pressure is withdrawn from the lever. It required, in fact, but a change of side upon the bar upon which they are hung, so that the weight of the scraper may either keep them in contact with the wheel, or allow them to swing clear of it. But, without discussing the question as to how far the scraper described in the sixth claim of this Bergen patent may be said to have been anticipated in the earlier patents, it is

enough to say that the proof in this case shows abundantly and conclusively that George W. Brown used scrapers upon machines which he manufactured in the year 1861, and over 1,100 of which were put into the market and sold in the spring of 1862, where the scrapers used are precisely the kind shown in the Bergen patent No. 46,629. It is true, that courts are usually wary in allowing parol evidence to defeat a patent; but the proof in this case is so complete and satisfactory as to the number of machines made, the time when they were made, and one of the original machines is also produced in evidence, with the testimony of the persons who bought it in 1862 and used it that year, showing an automatically-acting scraper, precisely as described in the Bergen patent, that it leaves no room for doubt that this device was well known, and in public use for at least three years before the date of the Bergen patent. The bill is therefore dismissed for want of equity.